[Cite as *First N. Corp. v. Olmsted Falls Bd. of Zoning Appeals*, 2014-Ohio-487.]

**[Please see vacated opinion at 2013-Ohio-5580.]**

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99681**

**FIRST NORTH CORPORATION, ET AL.**

PLAINTIFFS-APPELLANTS

vs.

**BOARD OF ZONING APPEALS
OLMSTED FALLS, OHIO, ET AL.**

DEFENDANTS-APPELLEES

**JUDGMENT:**
REVERSED

Administrative Appeal from the
Cuyahoga County Court of Common Pleas
Case Nos. CV-627542 and CV-627672

**BEFORE:** Stewart, P.J., S. Gallagher, J., and E.A. Gallagher, J.

**RELEASED AND JOURNALIZED:** February 13, 2014

**ATTORNEYS FOR APPELLANTS**

Sheldon Berns
Benjamin J. Ockner
Gary F. Werner
Berns, Ockner & Greenberger, L.L.C.
3733 Park East Drive, Suite 200
Beachwood, OH    44122


**ATTORNEYS FOR APPELLEES**

Paul T. Murphy
Paul T. Murphy Co., L.P.A.
5843 Mayfield Road
Mayfield Hts., OH    44124

James A. Climer
John D. Pinzone
Frank H. Scialdone
Mazanec, Raskin & Ryder Co., L.P.A.
100 Franklin's Row
34305 Solon Road
Cleveland, OH    44139

ON RECONSIDERATION[1]

MELODY J. STEWART, P.J.:

{¶1} Olmsted Industrial Park[2] ("OIP") owns 54 acres of unimproved land in the city of Olmsted Falls. The land is zoned for light industrial use. OIP claims the land is unsuitable for that purpose, and when a developer proposed using the land for senior-targeted cluster housing, OIP asked the city of Olmsted Falls to rezone the land or grant it a variance. The city denied both requests. As OIP pursued its administrative remedies in the court of common pleas, it filed a declaratory judgment action seeking to have the zoning classification declared unconstitutional as applied to the property. It also asked the court to commence proceedings to appropriate the property and pay just compensation because the deprivation of economically viable use of the property, as currently zoned, constituted a regulatory taking per se. The court upheld the administrative decisions and, following a trial on the substantive constitutional issues, ruled that OIP failed to show beyond fair debate that the present zoning classification constituted a categorical taking of the property.

{¶2} We conclude that the court erred by affirming the city's refusal to grant a variance. OIP presented unrebutted evidence to show that the present zoning classification worked an unnecessary hardship because the property was unmarketable as light industrial space due to a

---

[1] The original announcement of decision, *First N. Corp. v. Bd. of Zoning Appeals Olmsted Falls*, 8th Dist. Cuyahoga No. 99861, 2013-Ohio-5580, released December 19, 2013, is hereby vacated. Appellants' application for reconsideration brought to the court's attention an assignment of error that should have been, but was not, addressed. This opinion, issued upon reconsideration, is the court's journalized decision in this appeal. *See* App.R. 22(C); *see also* S.Ct.Prac.R. 7.01.

[2] First North Corporation, the named plaintiff, "is the development entity associated with OIP" and both companies are owned and operated by the same principal. Appellant's brief at fn. 1. The parties collectively refer to these entities as "OIP," so we do as well.

poor regional economy, issues with the size and location of the property, and competition from other light industrial sites (including one funded by the city). The city offered no evidence of its own, insisting that it could deny a variance in order to diversify its tax base even though it conceded that the undeveloped property was generating no tax revenue and had not done so in the 13 years that OIP owned the property. In essence, the city's position, and one that the court accepted, was that OIP could be forced to wait indefinitely on the chance that economic conditions might change in the future and create a demand for light industrial use. This was an arbitrary and unreasonable position that amounted to an abuse of discretion.

I

A

{¶3} R.C. 2506.04 states:

> The court may find that the order, adjudication, or decision is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record. Consistent with its findings, the court may affirm, reverse, vacate, or modify the order, adjudication, or decision, or remand the cause to the officer or body appealed from with instructions to enter an order, adjudication, or decision consistent with the findings or opinion of the court.

{¶4} The Ohio Supreme Court has given the following characterization of the type of review to be given by the court of common pleas in an administrative appeal:

> Although a hearing before the Court of Common Pleas pursuant to R.C. 2506.01 is not *de novo*, it often in fact resembles a *de novo* proceeding. R.C. 2506.03 specifically provides that an appeal pursuant to R.C. 2506.01 "shall proceed as in the trial of a civil action," and makes liberal provision for the introduction of new or additional evidence. R.C. 2506.04 requires the court to examine the "substantial, reliable and probative evidence on the whole record," which in turn necessitates both factual and legal determinations.

(Emphasis sic.) *Cincinnati Bell, Inc. v. Glendale*, 42 Ohio St.2d 368, 370, 328 N.E.2d 808 (1975).

**{¶5}** The power to review and hear additional evidence necessarily means that the court of common pleas "must weigh the evidence in the record." *Dudukovich v. Lorain Metro. Hous. Auth.*, 58 Ohio St.2d 202, 207, 389 N.E.2d 1113 (1979). But the court of common pleas cannot simply substitute its judgment for that of the administrative agency. The standard of review set forth in R.C. 2506.04 is limited to determining whether there is a "preponderance" of evidence to support the administrative decision, so the court of common pleas must affirm if a preponderance of reliable, probative, and substantial evidence exists. *Id.*; *Smith v. Granville Twp. Bd. of Trustees*, 81 Ohio St.3d 608, 612, 693 N.E.2d 219 (1998).

B

**{¶6}** When a court of appeals reviews a common pleas appellate decision in an administrative appeal, its standard of review is far more circumscribed. In an R.C. Chapter 2506 administrative appeal from a common pleas court decision in a zoning case, we can review the judgment of a lower court only on questions of law — we do not have the same extensive power to weigh the preponderance of substantial, reliable, and probative evidence as is granted to the lower courts. *Henley v. Youngstown Bd. of Zoning Appeals*, 90 Ohio St.3d 142, 147, 735 N.E.2d 433 (2000). However, "within the ambit of 'questions of law' for appellate court review would be abuse of discretion by the common pleas court." *Kisil v. Sandusky*, 12 Ohio St.3d 30, 34, 465 N.E.2d 848 (1984), fn. 4.

II

**{¶7}** The city's zoning code defines a "variance" as a "modification of the literal provisions of this Planning and Zoning Code where such modification will not be contrary to the public interest." Olmsted Falls Codified Ordinances 1204.03(b)(129). Under the city's ordinances, its board of zoning appeals has the authority to authorize a variance when "strict and

literal interpretation and enforcement" of the zoning code would yield "results inconsistent with the general purpose of this Code." Olmsted Falls Codified Ordinances 1206.05(b)(2).

{¶8} In general terms, a use variance is an application for a deviation from the permitted uses in a zoning district. The city zoning code allows the board of zoning appeals to grant a use variance if it determines that (1) the variance will result in no substantial detriment to any surrounding property, (2) the intent and purpose of the zoning code is not impaired, and (3) the applicant shows either: (a) unnecessary hardship or (b) exceptional circumstances. Olmsted Falls Codified Ordinances 1032.08(c). "Unnecessary hardship" exists when the "literal interpretation" of the zoning code would result in "unnecessary hardships peculiar to the property involved and not based on conditions created by the owner[.]" Olmsted Falls Codified Ordinances 1032.08(c)(1)(a). In addition, the ordinance makes it clear that "limiting of possibilities of economic advantage do not constitute unnecessary hardship." "Exceptional circumstances" exists when zoning code restrictions apply to the property in question "that do not apply generally to other properties or classes of uses in the same zoning district." Olmsted Falls Codified Ordinances 1032.08(c)(1)(b).

III

A

{¶9} The land in question is located within an I-2 light industrial district. That zoning restriction has been in place for more than 130 years, however, the property has never been used for industrial purposes (it was apparently farmland until the 1930s and went fallow). The I-2 industrial district provides for industrial and manufacturing uses "which may utilize products, materials, and/or processes that create smoke, noise, odor, dust, fumes, glare, or other objectionable characteristics, but the impacts of which are controlled in compliance with

permitted uses, performance standards, and setback and screening requirements." Olmsted Falls Codified Ordinances 1258.01(b). In essence, the I-2 light industrial use zone prohibits manufacturing utilizing raw goods and is limited to the "processing, assembling or packaging of goods, conducted within wholly enclosed buildings." Olmsted Falls Codified Ordinances 1258.03. Other permitted uses include offices of professional occupations, research laboratories, nonmanufacturing business conducted in wholly enclosed buildings, storage and distribution, wireless communication towers or facilities, and household services like laundry or dry-cleaning. *Id*. Expressly excluded as an I-2 use are "dwellings of any kind[.]" Olmsted Falls Codified Ordinances 1258.04(a).

B

{¶10} OIP purchased the unimproved land in 2000 from Dairypak Corporation. The site is a mostly rectangular lot, with residential housing on the north perimeter and train tracks on the south perimeter. An electrical substation and electrical transmission towers intersect the far southwest corner of the land. Dairypak Corporation maintains a packaging plant on the southeast corner of the property. There is access to the property by only two roads: Fitch Road on the west; Mapleway Drive on the east. Both roads carry only two-lanes of traffic with no left-turn lanes. Residential housing exists on the other side of each road.

{¶11} In its application for a variance, OIP made the following argument relative to the property's location making it unsuitable for development as light industrial:

> The features of the Property that underlie its unsuitability for [light industrial] uses include without limitation its location, remoteness from interstate access, and proximity to transportation alternatives (i.e., rail) that are outmoded, given that the Property's permitted <u>light</u> industrial uses would be more suited to truck access. But even the truck access limitations of its permitted light industrial use clash with the surrounding residential environment. The transportation infrastructure surrounding the Property is by its nature suited to the area's abundant residential

users, not for significant truck traffic incident to light industry. Moreover, the Property's remoteness from similar industrial users and districts disconnects it from area where such suitable infrastructure might be available. These exceptional circumstances uniquely affect the Property in ways not generally applicable to other industrially zoned property.

(Emphasis sic.)

{¶12} OIP also argued that external economic factors had softened the need for the type of "flex" industrial space contemplated by the zoning. "Flex" industrial space can, consistent with uses permitted under the I-2 zoning classification, be used to house several different types of traditional business structures, from office space to warehouses to light industrial. At the time OIP purchased the land, the vacancy rate for industrial flex space in the greater Cleveland area was 12 percent, but at the time of the variance application, the vacancy rate stood at 21 percent.

{¶13} The high vacancy rate for flex industrial space was brought about for two reasons: lack of demand and an influx of industrial flex space to the region. The commercial real estate experts collectively testified that the demand for new, light industrial flex space in the greater Cleveland metropolitan area was functionally nonexistent. In addition to the lack of demand, area plant closures had resulted in a repurposing of existing factories into industrial flex space. These newly-repurposed spaces were priced significantly cheaper than any space that OIP might construct. For example, one expert noted that a closed auto factory in Lorain, Ohio, had been bought by a developer. The expert believed the converted factory would charge $1.50 per square foot in rent for what he called a "feature rich facility." Were OIP to build on a speculative basis (meaning without any commitment from prospective tenants), its cost in new construction would require it to charge as much as $5 per square foot in rent for similar space. The experts agreed that industrial flex space was exceptionally price-sensitive, with only slight differences in rent being the determining factor for many businesses. And the higher price that

OIP would have to charge would be in a market in which the lack of demand and surplus inventory had caused the price charged per square foot to fall in the last five years.

{¶14} A real estate appraiser was more blunt in his assessment of the viability of the site for light industrial flex space: "The conclusion is flatly that this is not an industrial development location. The reason that it is not is that there is no way that you can get a reasonable investment back, a reasonable rate of return, from this property because it starts out with so many debilitating factors."

{¶15} The experts said that the lot was too small to contemplate development of a light industrial park. One expert said the property lacked the kind of visibility needed to "get some synergy, if you will, as far as industrial development." Another expert said: "54 acres is too small to make a dent in anything. And nobody is going to look at that property for [light industrial] use."

{¶16} The property also suffered from poor access to roads and highways, making it incompatible with the needs of industrial users. The property is served only by two-lane roads that run through residential areas. The size of truck utilized by light industrial companies is too big for the type of roads running through residential areas. This problem is exacerbated because neither road contains a left-turn only lane.

{¶17} Location was another issue — the property bordered on residential areas and lacked direct access to interstate highways and other commercial amenities. The OIP property had been unused for more than 70 years and local residents who presumably enjoyed the quiet, nonuse of the property over that period voiced significant opposition to the planned industrial park.

{¶18} Apart from resident concern over increased traffic was the problem of getting to the site. All of the experts agreed that the property lacked immediate access to interstate highways.

The property had been zoned for light industrial at a time when its direct access to a rail line was considered a positive and the interstate highway system had not been fully developed. However, in the present day, light industrial users rely on trucking, not rail. One expert noted that where light industrial expansion had recently occurred in other locales, that expansion had been driven by direct highway access. He said that, barring direct highway access at the OIP property, "you're going to have trucks coming * * * back and forth, and it is just not practical."

{¶19} In addition to the lack of highway access was the property's isolation from similar business activities that could act as "other industrial demand generators" to drive additional development. In other words, the property lacked proximity to retail-commercial activities, restaurants, amenities, and services that would naturally support an expansion of industrial use.

{¶20} OIP also showed that the property faced competition from the city's own Joint Economic Development District ("JEDD") with Olmsted Township. According to the JEDD's marketing materials, the site (to be known as "Stearns Crossing Business Park") consists of more than 250 acres of land within Olmsted Township with "immediate access to major highways." The JEDD sits just 1.35 miles west of the OIP site, and is located along the same rail line that borders the OIP property. The JEDD has the inherent competitive advantage of being developed by governmental entities that can improve off-site infrastructures with government funding. One expert said that larger properties like the JEDD have "a shot at getting * * * public funding and having users in there that have special uses."

{¶21} Viewing all of these factors together, the experts unanimously concluded that the site was simply unsuitable for light industrial development. A real estate broker who spent two years unsuccessfully marketing the property for OIP concluded that

[t]he potential for development of the subject Olmsted site is so distant as to be undefinable; therefore we might guess that it would take <u>at least 25-30 years</u> to reach full development, even assuming that the Greater Cleveland Market were to become robust soon (which it is not and likely will not).

(Emphasis sic.)

**{¶22}** The broker concluded that without commitments from prospective tenants, "it would be a serious mistake" for OIP to build industrial flex space on a speculative basis.

**{¶23}** Another real estate broker said that if OIP came to him and asked him to market the property for industrial use, "I would not market it and I would not waste my time trying to market this as an industrial use. It's just not there and won't be there." A city planner for a number of area communities echoed the concerns of OIP's experts and gave his opinion that "regardless of the market, I don't believe that this property will ever be developed for industrial use."

C

**{¶24}** The city's objections to the rezoning were based on its desire to pursue a long-term strategy to diversify its tax receipts away from the current 92 percent residential. The OIP site constituted more than 50 percent of the city's industrially-zoned land (the JEDD is located in Olmsted Township). The city feared that granting a variance would negatively impact the city's desire to have a more balanced tax base.

**{¶25}** In addition to diversifying its tax base, the city feared that additional residential expansion would increase the financial burden on its school system at a time when the residents had defeated three consecutive school levies. City officials also expressed the concern that senior residents who did not have children who used the school system would be disinclined to vote for school levies. The superintendent of the Olmsted Falls School District testified that he was "hard pressed to believe that a residential development for senior citizens in Olmsted Falls is

any more marketable than an industrial park" and that a 192-unit development could produce an additional 200 students for the school system.

D

{¶26} The city council upheld the board of zoning appeals, finding that the property was suitable for light industrial use given that Dairypak, the entity that sold the property to OIP, had been using adjacent property for that very purpose for more than 50 years. The city council also expressed its concern that granting a variance would upset the city's goal of expanding its industrial tax base to counter its heavy reliance on residential taxes. The city council was unsympathetic to OIP's claim that the shape of the property was ill-suited to industrial development, claiming that OIP knew the shape of the property when it purchased it and that the city did not have "the onus * * * to save [OIP] from a bad investment." The city council rejected OIP's assertion that the economic downturn meant that there was no demand for the type of industrial use required by the present zoning — it believed (as of May 2007) that the economy "has begun to rebound to turning positive" and that in any event OIP "made a hasty purchase" and "failed to investigate the business cycle" and that the city "should not rezone the property against the concepts of our Master Plan just because there is a kink in the business cycle." Finally, the city council found that its commitment to a joint economic development district lying outside its borders did take away from its commitment to pursue other light industrial development within the city.

{¶27} The court affirmed the city's decision, finding the order "is not unconstitutional, illegal, arbitrary, capricious, unreasonable or unsupported by a preponderance of substantial, reliable and probative evidence on the whole record."

IV

**{¶28}** OIP argues that the court abused its discretion by upholding the city's refusal to grant it a use variance from the I-2 light industrial zoning classification. OIP sought the variance on grounds that strict enforcement of the zoning code would result in an unnecessary hardship peculiar to the property. That hardship, claimed OIP, was that external economic factors dried up demand for light industrial facilities. And that lack of demand, coupled with intrinsic issues relating to the size of the lot and poor access to public highways, meant that there would be no demand for light industrial facilities for the foreseeable future.

A

**{¶29}** There is no question that OIP presented uncontradicted evidence in support of the use variance. However, the city's position in the court of common pleas was that it "does not have the burden to prove anything, and in fact in most variance proceedings the municipality presents no evidence with regard to any question of fact. Consequently, the lack of evidence presented by the City has nothing to do with whether or not [OIP] carried [its] burden." R. 17, Brief of appellee City of Olmsted Falls, at 8.

**{¶30}** The city's argument is correct only insofar as it states the basic premise that a decision by a board of zoning appeals is presumed correct and the party contesting the board's decision has the burden of showing why it was wrong. *Consol. Mgt., Inc. v. Cleveland*, 6 Ohio St.3d 238, 240, 452 N.E.2d 1287 (1983). But the standard of review applied by the court of common pleas is to weigh the evidence to determine whether the board's decision is supported by a preponderance of reliable, probative, and substantial evidence. *Dudukovich*, 58 Ohio St.2d at 207. The party seeking a variance has the initial burden of offering evidence, but once that burden has been met, the opposing party cannot demur — it must come forward with its own

evidence. And it requires no citation to say that the absence of any factual issue turns a matter into a question of law that we review de novo.

{¶31} Our recitation of the facts should make it clear that OIP carried its burden of presenting evidence that an unnecessary hardship would result if the city denied it application for a use variance. It offered significant evidence to show not only that the property could not be developed consistent with the I-2 light industrial zoning classification, but that it would not be viable for that purpose in the future. The market for light industrial use had evaporated given the poor economic climate and the availability of other cheaper, more accessible sites, including the city's own attempt to market industrial flex space with its nearby JEDD.

B

{¶32} The city offered nothing to contest OIP's evidence and, in fact, agrees that the present business climate precludes light industrial development. Its primary reason for denying the use variance was twofold. First, it appeared to argue a form of caveat emptor, stating its belief that OIP made a bad business decision in purchasing land that it knew was zoned for light industrial use and that decision "does not put the onus on the city to save the owner from a bad investment." Second, it argued that its desire to balance its overwhelming residential tax base with a commercial base was paramount to any short-term hardship that OIP might suffer in a cyclical economy.

1

{¶33} Although the city's zoning code states that an "unnecessary hardship" does not exist when the reasons for requesting the variance are based on conditions created by the owner, there was no evidence that OIP caused its own hardship. At the time it purchased the land in 2000, vacancy rates for industrial flex space were low and the experts agreed that OIP could

viably construct for that purpose. However, by the end of 2001, an economic downturn occurred that caused a lowering of rents. As businesses closed or moved out of state, those facilities came on the market for lease. Preexisting facilities had the advantage of being able to offer lower rents (they cost less to build); new facilities of a kind contemplated by OIP were handicapped by construction costs that forced them to charge more rent to be competitive. So OIP's new facility could not hope to compete against existing facilities, particularly when those existing facilities were more accessible to highways. The economic conditions were intervening, external factors not caused by OIP.

2

{¶34} The city desired to balance its tax revenue because its current tax base was more than 90 percent residential. It characterized current economic conditions as "a kink in the business cycle" that OIP should wait out. The court found this rationale persuasive, stating:

> If the Property were rezoned and OIP's residential development came to fruition and economic times change, then there would be no way to revert the property to industrial, and the City's tax base will remain heavily imbalanced with no room for recovery. If the City is correct and the economy begins to improve, and should a business choose to build on that property then the City and the community will benefit from additional income and real property taxes.

{¶35} The court relied on a number of implied "ifs" to support its conclusion, but "ifs" are not facts. The city offered no evidence of any kind to show the future viability of the land as industrial. Instead, it relied on conclusions such as "real estate development is cyclical, and one type of development is not always the most profitable at a certain point in time." *See* Appellee's brief at 13. In fact, the court appeared to accept the city's assertion that an improving economy would permit light industrial development without regard for the uncontradicted expert testimony

that the land would *never* be developed as light industrial, regardless of whether business conditions improved.

{¶36} We agree that temporary economic downturns do not justify knee-jerk zoning changes. On the other hand, the city's position would require a landowner to wait indefinitely before showing that economic conditions have created an unnecessary hardship. This conclusion is supported by the city's argument that one of OIP's experts said that he held onto land in the city of Strongsville for 25 years before developing it, so it would be reasonable to expect OIP to do the same.

{¶37} OIP purchased the land in 2000 and spent four years unsuccessfully marketing it for light industrial development. At present, conditions have not improved to the point where there is any demand for light industrial facilities within the city. Indeed, those same conditions have meant that the city has yet to turn the first shovel on its own JEDD — a joint venture that predated OIP's purchase of the property — even though the experts agreed that the JEDD was a superior industrial development opportunity because of its size, location, and public funding. While it is true that the land was privately owned for many years, it is equally true that the company that owned the land did nothing with it for more than 40 years. From the point of view of a private investor, idle land is nonproductive, so it stands to reason that it was not developed because of lack of demand. That lack of demand continues to this day. To accept the city's argument would condemn the land to lie fallow in perpetuity, or until the city tires of collecting no revenue from the land.

{¶38} At this juncture, it is useful to ask why the city would be content to forsake residential development and prospect of tax revenue to let the land lie unused and generate no tax revenue. The city's primary answer — diversification of tax revenue — provides only a part of

the answer. With more than 90 percent of the city zoned for residential use, those residents require significant services from the city. The cost of providing those services has, by all accounts, led to high taxes in Olmsted Falls. The city believes that industrial users are far less of a burden on city services than residential users, so it wishes to encourage industrial development. In this case, retaining land for light industrial use that generates no income would be more valuable to the city than using the land for residential housing that would require potentially more services than the land would generate in tax revenue. For example, the school superintendent testified that the city school system was stretched beyond physical capacity, with some students being taught in modular classrooms. The city residents had rejected three straight school levies and the school superintendent feared that new housing could bring as many as 200 more children into the district.

{¶39} The superintendent testified outside of his field of competency. He gave his opinion that "I'm hard pressed to believe that a residential development for senior citizens in Olmsted Falls is any more marketable than an industrial park." Unlike OIP's experts who had extensive credentials in urban planning and commercial real estate, the superintendent offered no reason for the board to give any credence to his opinion on the potential marketability of senior-focused housing.

{¶40} What is more, the superintendent's statement about an influx of new students was premised on his assumption that OIP's development would not be age-restricted. OIP told the board of zoning appeals and city council that senior-focused housing would necessarily target "empty nester" homeowners. In fact, OIP raised the possibility that the proposed development could legally be limited to residents of a preestablished age in order to minimize the school district's exposure to more students. *See* Housing for Older Persons Act, 42 U.S.C. 3601 et seq.

(allowing communities to market themselves as "55+"or "age-restricted" provided that 80 percent of the occupied units are occupied by at least one person who is 55 years of age or older). Admittedly, OIP's witnesses conceded that even if restricted to seniors, its planned residential housing could bring in up to 15 additional students. But that number is significantly lower than the 200 postulated by the superintendent.

{¶41} In any event, OIP offered evidence to assuage the city's concerns about diversifying its tax base, noting that recent changes in Ohio's tax structure had made reliance on a light industrial base less appealing as a source of tax revenue for municipalities. A public policy analyst said that in ten years the percentage of tax revenue generated by business properties had fallen from 31 percent to less than 12 percent. For that reason, the public policy analyst said, "these industrial office pieces that we were telling people to hold aside and save to balance out their long-term sustainability don't do that anymore." Her testimony was based on her conclusion that "you can build a whole boatload of business today in your community and not get nearly the tax base balance that we all thought we were going to get in 1994."

{¶42} OIP also offered an opinion by an urban planner — the same urban planner that assisted the city in drawing up its master plan — challenging the continued classification of the property as light industrial. He noted that the city designated the property light industrial because it had been the practice to do so with land adjacent to railroad tracks. The planner noted that the practice was changing, and "the more marketable industrial sites are increasingly located convenient to freeway interchanges or along major highways." The planner recognized the city's desire to diversify its tax base away from residential, but noted that the city's master plan acknowledged that "alternative housing (other than a standard single-family home and lot) could result in tax revenues that exceed service costs."

**{¶43}** The city assails the planner's opinion, noting that he helped write the 1997 zoning code to comply with the master plan that sanctioned the continued use of the land as light industrial. It argues that as a paid expert for OIP, the planner's opinion carries no credibility. The planner's opinion, however, was consistent with other experts who testified that the market for light industrial space had become extremely competitive and that the location of the property put OIP at a huge disadvantage for developing it. So to the extent the planner's position had changed in 15 years, that change reflected the new realities facing light industrial development.

V

**{¶44}** OIP more than carried its burden of offering evidence showing that the present I-2 light industrial zoning classification worked an unnecessary hardship on it because changing economic conditions, inherent site limitations, and competition from other sources made light industrial development unviable. In response, the city offered no evidence of any kind because it erroneously insists that it need not offer anything. That position is patently wrong — once OIP met its burden of showing that the present zoning works an unnecessary hardship on it, the burden shifted to the city to show otherwise. To accept the city's argument that it had no obligation to offer evidence to rebut a landowner's evidence in support of a variance would mean that no opposed variances should ever be granted.

**{¶45}** The city agrees that presently, the land cannot viably be developed as zoned, but maintains that its interest in diversifying its tax base is sufficient reason to deny the variance. The city's argument appears to be premised on an outdated sense of the kind of revenue it could generate. What is more, diversification as a long-term goal is simply unrealistic because the land as presently zoned is not generating any tax revenue nor does there appear to be any possibility that it will at some point in the future. OIP spent four futile years trying to market the

property and now 13 years have passed with no development opportunity in sight. In fact, the city's own joint venture industrial park, conceived before OIP purchased its property, has yet to be constructed, even though both parties agreed that the city's joint venture was a superior opportunity. While the economy does operate in cycles, the city offered no evidence to counter the expert opinion that the current bad economy is not just a product of a cycle, but an economic reality endemic to the entire region.

{¶46} With no evidence in dispute, we find as a matter of law that the court erred by affirming the city's refusal to grant OIP's request for a use variance based on unnecessary hardship. The city's decision to deny the use variance in the face of unrebutted evidence of unnecessary hardship was arbitrary and its insistence that the land lay fallow indefinitely was unreasonable. The first assignment of error is sustained.

VI

{¶47} We next consider OIP's argument raised in its second assignment of error that the city's zoning regulations resulted in a taking for which just compensation must be paid. Although we have concluded that the court erred by refusing to reverse the city's refusal to grant a use variance on the subject property, OIP maintains that refusal was made in the face of overwhelming evidence that the I-2 zoning regulations precluded all viable economic use of the property. It thus argues that it was entitled to damages for a temporary taking that occurred during the period between the time the city refused to grant the variance and the date of our judgment.

{¶48} Article I, Section 19 of the Ohio Constitution establishes the inviolability of private property and requires the state to compensate property owners whenever "taken." The concept of a "taking" as embodied in both the Ohio Constitution and the Fifth Amendment to the United

States Constitution ("nor shall private property be taken for public use, without just compensation") generally applies to the direct, physical appropriation of private property. It was not until 1922 that the United States Supreme Court held that the Constitution required the government to directly compensate a landowner whose property was not physically taken, but rather whose use of such property was restricted by regulation. *See Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 412, 43 S.Ct. 158, 67 L.Ed. 322 (1922); *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). That kind of taking may occur when a land-use regulation "'does not substantially advance legitimate state interests or denies an owner economically viable use of his land.'" *Id*. at 1016, quoting *Agins v. Tiburon*, 447 U.S. 255, 260, 65 L.Ed.2d 106, 100 S.Ct. 2138 (1980) (footnote omitted).

{¶49} Our discussion in part I of this opinion makes it clear that the city should have granted OIP's requested use variance because the I-2 light commercial zoning classification imposed an unnecessary hardship on OIP's use of the property. This was essentially a finding that OIP proved that the I-2 light commercial zoning classification deprived it of all beneficial use of the property because the permitted use was not economically feasible or could not be efficiently continued. *See Warner v. Jerusalem Twp. Bd. of Zoning Appeals*, 63 Ohio Misc.2d 385, 392, 629 N.E.2d 1137 (C.P.1993). But that holding does not necessarily mean that OIP was deprived of all use of the property such that the I-2 light commercial zoning classification operated as a compensable, temporary taking.

{¶50} To put it another way, the unnecessary hardship standard for granting use variances is not the same as the constitutional taking standard. The "hardship" standard necessarily admits that there is *some* use for land, but that use works an unnecessary hardship on the landowner. The taking standard, as applicable here, is one applying to "a regulation that permanently requires

a property owner to sacrifice all economically beneficial uses of his or her land." *Arkansas Game & Fish Comm. v. United States*, ___ U.S. ___, 133 S.Ct. 511, 518, 184 L.Ed.2d 417 (2012), citing *Lucas*, 505 U.S. at 1019. The difference between the two standards explains why a variance from a zoning ordinance can be granted under conditions in which the application of that particular zoning ordinance would not result in an unconstitutional taking of property. *See, e.g., Garelick v. Sullivan*, 987 F.3d 913, 917 (2d Cir.1993); 8 McQuillin, *Municipal Corporations*, Section 25.167, at 761 (3d Ed.1991). ("A condition of difficulty or hardship is not deemed equivalent to a taking of property, in the constitutional sense[.]") (Footnote omitted.)

{¶51} Applying these principles to this case shows that the zoning classification worked an unnecessary hardship to OIP, but it did not deprive OIP of all economically beneficial use of its land. In other words, OIP could have built an industrial park on the land consistent with the I-2 zoning classification. Indeed, it purchased the property with the intention of developing and building an industrial park and marketed the property accordingly for several years before it was forced to conclude that economic conditions rendered that type of development a losing proposition. So even OIP must concede that at the time it purchased the property, the zoning classification did not deprive it of all economically beneficial use and rise to the level of a taking without just compensation.

{¶52} Judgment reversed.

It is ordered that appellants recover of appellees their costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MELODY J. STEWART, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
EILEEN A. GALLAGHER, J., CONCUR
99681